| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 4:13-CR-261 |
| | § | |
| CASEY LUKER | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Casey Luker's ("Luker") *pro se* Motion for Compassionate Release or Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)(i) (#57). The Government filed a response in opposition (#60). United States Probation and Pretrial Services ("Probation") conducted an investigation and recommends that the court deny Luker's request for compassionate release. Also pending before the court is Luker's Motion to Supplement Request for Compassionate Release (#58), wherein Luker provides a copy of the warden's denial of his request for compassionate release or home confinement. Having considered the motions, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that Luker's request for compassionate release (#57) should be DENIED and his motion to supplement (#58) should be GRANTED.

I.  Background

On October 9, 2013, a Plano, Texas, police officer initiated a traffic stop of Luker for driving over the speed limit and making unsafe lane changes. During the traffic stop, the officer smelled marijuana and called backup officers. A search of Luker's vehicle resulted in the discovery of $7,147.00 in United States currency, a drug ledger, a receipt book, approximately 24.32 grams of methamphetamine hidden in a vent below the center armrest, and 1.89 pounds of methamphetamine in the dashboard where the passenger side airbag should have been. According

to a Drug Enforcement Administration laboratory report, Luker was found in possession of 831.4 grams of methamphetamine chloride with a substance purity of 89.4%, which constitutes 743.2 grams of actual methamphetamine. On July 16, 2014, Luker pleaded guilty pursuant to a non-binding plea agreement to Count One of the Indictment, which charged him with Possession with the Intent to Manufacture and Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Methamphetamine or 50 Grams of Methamphetamine (actual). On February 18, 2015, the court sentenced Luker to 200 months' imprisonment, followed by a five-year term of supervised release. His conviction and sentence were affirmed on appeal on January 6, 2016. Luker is currently housed at the high security United States Penitentiary in Florence, Colorado ("USP Florence - High"), with a projected release date of January 17, 2028. Probation reports that as of August 24, 2020, Luker had served approximately 41% of his sentence.

II.   Analysis

On December 21, 2018, the President signed the First Step Act of 2018 into law. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served

> at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See United States v. Franco*, No. 20-60473, 2020 WL 5249369, at *1 (5th Cir. Sept. 3, 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *Franco*, 2020 WL 5249369, at *1 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing

3

compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *Franco*, 2020 WL 5249369, at *1 ("The text . . . outlines two routes a defendant's motion can follow to be properly before the court. Both routes begin with the defendant requesting that 'the [BOP]' 'bring a motion on the defendant's behalf.'"); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, No. 20-5000, 2020 WL 3989451, at *3 (10th Cir. July 15, 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Luker avers that he submitted a request for compassionate release to the warden of the facility where he is housed on July 1, 2020, although Probation reports that he submitted his early release request on July 9, 2020. Nonetheless, Luker provides a copy of the warden's determination dated July 17, 2020, finding that he was ineligible for direct home detention. It is unclear whether Luker requested the warden to file a motion for compassionate release on his behalf. Although Luker may have complied with the exhaustion requirement before filing the instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to reduce his sentence.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission. 18 U.S.C § 3582(c)(1)(A). The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

Luker, age 38, contends that he is eligible for compassionate release due to his medical condition, circumstances presented by COVID-19, and Amendment 782 of the USSG. The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* § 1B1.13 cmt. n.1(A).

Luker asserts that BOP medical staff discovered "a [sic] estrogen secreting tumor as well as a 2.7 cm hypodense lesion within his right liver," which, according to Luker, shows that he suffers from an early stage of cancer and makes him highly susceptible to COVID-19. Luker's medical records reflect that in April 2020, Luker reported noticing weight gain around his lower abdomen progressively for several weeks, increased urination, and the growth of breast tissue. Around this time, Luker sustained a fractured mandible for which he was prescribed pain medication, antibiotics, and a diet of soft foods.[2] Medical staff at the BOP noted new onset gynecomastia (the benign enlargement of male breast glandular tissue) on April 23, 2020, and ordered laboratory tests which later revealed that he had elevated serum estrogen. Luker was prescribed anastrozole for painful breasts. As a result of Luker's gynecomastia and elevated serum estrogen, an ultrasound of his scrotum and testicles and a CT scan of his abdomen were

---

[2] Luker explained: "I was trying to climb on to my bunk and I fell and hit the left side of my face. I thought the pain would go away but now I am realizing my face is swollen and I cannot eat."

ordered.  Luker attached to his motion the results of the ultrasound and CT scan, which were performed at St. Thomas More Hospital in Canon City, Colorado, on May 28, 2020.  The ultrasound identified a 5 mm right epididymal head cyst, but the impression from the ultrasound reports, "No suspicious findings."  The CT scan report notes mild bilateral gynecomastia, normal adrenal glands, and indeterminate 2.7 cm hypodense lesion within the right lobe of the liver.  The radiologist recommended following up with a multiphasic CT scan of the abdomen.  Luker's medical records in July indicate that Luker's gynecomastia was worsening, a multiphasic CT scan of his liver was pending, and medical staff referred Luker for an endocrinology consultation.

   According to Probation, the BOP representatives consulted medical staff and determined that Luker's medical issues are not life threatening.  Although Luker is scheduled for additional tests, noncancerous liver lesions are common, and he is waiting for additional tests to determine whether the lesion is benign.  Probation notes that Luker does not show signs of weight loss or anything else that would cause the physician to believe the lesion is cancerous at this time.  Luker's medical records show that he was classified as overweight in April 2020 and as obese since May 2020.  The Government points out that Luker is currently classified as a Care Level 1 inmate, indicating that he is healthy or requires only simple chronic care.  Contrary to Luker's assertion that he is experiencing the early stages of cancer, he has not been diagnosed with cancer.  Hence, Luker's medical summary does not meet the criteria listed above.  None of his medical conditions is terminal (with an end of life trajectory within 18 months) or substantially diminishes his ability to provide self-care.  Luker has failed to establish that a qualifying medical condition exists that would constitute extraordinary and compelling reasons to reduce his sentence.  In any event, "compassionate release is discretionary, not mandatory," and where, as here, a prisoner

has engaged in "severe" criminal conduct and has an extensive criminal history, the district court has discretion to deny compassionate release after weighing the evidence. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

Luker's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

In the case at bar, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Luker for any "other" reason. In exercising its discretion, the court, likewise, finds that no extraordinary and compelling reasons exist in relation to Luker's situation. Luker erroneously asserts that the

sentencing guidelines changed after he was sentenced such that, upon applying Amendment 782, his base offense level would have been 34 instead of 36 for the amount of methamphetamine in his possession and, after a 3-level reduction for acceptance of responsibility, his total offense level would have been 31, with an applicable guideline range of 130 to 162 months' imprisonment. A review of Luker's Presentence Investigation Report ("PSR"), prepared September 8, 2014, reveals that Probation initially determined that his base offense level was 36, his total offense level was 33, and his criminal history category was VI, yielding a guideline range of 235 to 295 months' imprisonment. On January 7, 2015, Probation filed a Second Addendum to the PSR, noting that on November 1, 2014, an amendment to the USSG became effective. The impact of the amendment—also known as Amendment 782—reduced Luker's total offense level from 33 to 31 which, with a criminal history category of VI, yielded a guideline range of 188 to 235 months' imprisonment. During the sentencing hearing, the court, consistent with Probation's Second Addendum, concluded Luker's total offense level was 31 and his criminal history level was VI, resulting in a guideline range of 188 to 235 months' imprisonment. Hence, Luker, who was sentenced to 200 months' imprisonment based on a total offense level of 31, has already received the benefit of Amendment 782. Therefore, Luker's request for a sentence reduction in light of Amendment 782 lacks merit under both § 3582(c)(1)(A) and (c)(2).

Luker also expresses concern regarding the spread of COVID-19 among the prison population. Nevertheless, as of September 23, 2020, the figures available at www.bop.gov list 0 inmates (of 688 total inmates) and 1 staff member at USP Florence - High as having confirmed positive cases of COVID-19, 0 inmates and 2 staff members who have recovered, and no one as having succumbed to the disease. Thus, it appears that the facility where Luker is housed is

handling the outbreak appropriately and providing adequate medical care. Although Luker expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Luker, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated. *See Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, No. 16-214-05, 2020 WL 1940570, at *5 (W.D. La. Apr. 21, 2020))); *United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19). Luker has failed to establish

that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to reduce his sentence or warrant his release from imprisonment.

The court further finds that compassionate release is not warranted in light of the applicable factors set forth in § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *Chambliss*, 948 F.3d at 693-94.  The nature and circumstances of Luker's offense of conviction entails his possession of 743.2 grams of actual methamphetamine.  Luker has an extensive criminal history, including prior convictions for possession of marijuana (10), evading arrest, failure to identify (2), possession of a controlled substance (methamphetamine) (5), driving while intoxicated, possession of prohibited weapons, and driving with an invalid license.  Luker also failed to comply with previous terms of probation and was on parole at the time he committed the offense of conviction, resulting in a total criminal history score of 25 points.  Furthermore, Luker has a history of poly-substance abuse, beginning at age 12, including the use of 1-3.5 grams of methamphetamine per day at the time of his arrest.  In addition, he used a variety of aliases to conceal his criminal activities.  During his most recent incarceration, Luker was disciplined for his possession of a non-hazardous tool on January 15, 2016, and for his involvement in an assault without serious injury on June 1, 2019.  The BOP reviewed his history under the First Step Act and determined that he has a high risk for recidivism and is not a good candidate for home confinement.  In view of the circumstances surrounding Luker's offense of conviction, his extensive criminal history, and his history of substance abuse, the court cannot conclude that he would not pose a danger to any other person or to the community, if released from confinement.

Moreover, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention, for the purpose of determining which inmates are suitable for placement on home confinement. *See Collins*, 2020 WL 1929844, at *3. The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. To date, the BOP has placed 7,680 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020). The BOP has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Ambriz v. United States*, No. 4:20-CV-568-P, 2020 WL 3066861, at *2 (N.D. Tex. June 5, 2020); *United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement.").

In his Memorandum to the BOP dated March 26, 2020, Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney

General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Luker's track record is abysmal.

In short, Luker has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 2020 WL 1940570, at *4-5 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 2020 WL 1940570, at *5.

III.     Conclusion

In accordance with the foregoing analysis, Luker's Motion for Compassionate Release or Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)(i) (#57) is DENIED, and his Motion to Supplement Request for Compassionate Release (#58) is GRANTED.

SIGNED at Beaumont, Texas, this 25th day of September, 2020.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE